UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ONE BEACON INSURANCE COMPANY,

Plaintiff,

-against- 03 Civ. 6901 (LAK)

OLD WILLIAMSBURG CANDLE
CORPORATION, et al.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

Appearances:

John A.V. Nicoletti
Geoffrey J. Ginos
Samuel C. Coluzzi
NICOLETTI HORNIG CAMPISE & SWEENEY
*Attorneys for Plaintiff*

William H. Parash
Joshua L. Mallin
Jared Zola
WEG & MYERS, P.C.
*Attorneys for Defendant*
*Old Williamsburg Candle Corp., a Delaware Corporation*

LEWIS A. KAPLAN, *District Judge*.

Plaintiff moves for summary judgment declaring an insurance policy void. The question is whether the policy, notwithstanding a clause barring assignment, was in effect at the date of a loss that followed the sale of the covered business. As a reasonable juror could find that the

insurer's agent knew of the sale of the business and that the insurer nevertheless "renewed" the policy and continued to accept premium payments, the motion is denied.

*Facts*

In 1995, Meir Ackerman and Eugene Loevinger formed Old Williamsburg Candle Corp. ("OWC NY"), a Brooklyn based candle company incorporated in New York.[1] In 2001, OWC NY sought to acquire a marine insurance policy from One Beacon Insurance Company ("One Beacon") to cover the transport and storage of its inventory.[2] Loevinger discussed the matter with Yechiel Bromberg, the principal of Elite Insurance Agency ("Elite"), an insurance brokerage and agency that is party to two agency agreements with One Beacon.[3] Ultimately, One Beacon issued a marine insurance policy (the "Policy") as of April 29, 2001.[4] Underwriter Emanuel Palmieri executed the Policy on One Beacon's behalf. By its terms, the Policy is "continuous" and "in force until cancelled by either party giving the other (30) days written notice."[5] The Policy provides

1 Loevinger and Ackerman were the sole shareholders. *See, e.g.,* Rule 56.1 St. ¶ 1.

2 One Beacon operates under the trade name International Marine Underwriter when it underwrites marine insurance policies. Rule 56.1 St. ¶ 7.

3 The first was executed on November 24, 1998, while the second was effective April 1, 2002. They are identical in most substantive respects. "Agency Agreement" refers to the agreement in force at the relevant time. *See* Nicoletti Aff., Dec. 30, 2004, Exs. 1(A) and 1(B).

4 *See* Nicoletti Aff., Nov. 18, 2004, Ex. 1(1).

5 *Id.* ¶ 63.

further that it "shall be void if assigned or transferred without the written consent of [One Beacon]."[6] At the time the Policy was issued, its warehouse endorsement covered inventory in two Brooklyn warehouses, one at 300 Liberty Avenue and the other at 143 Alabama Avenue.[7]

On March 19, 2001, OWC NY executed an Asset Purchase Agreement ("APA" or "Agreement") pursuant to which OWC NY agreed to sell to New Williamsburg Candle Corp., a Delaware corporation ("OWC DE") "certain of the assets and [OWC NY's] candle business, as a going concern,"[8] including "all rights of [OWC NY] under leases, contracts, plans, commitments, licences, policies and permits."[9] The next day, OWC DE changed its name to Old Williamsburg Candle Corp.[10] Ackerman and Loevinger signed six-month employment contracts with OWC DE to assist in the transition.[11]

While the Policy did not expire by its terms, it came up for "renewal" around this time. One Beacon "renews" the Policy on its anniversary date by issuing a new endorsement if

---

6 *Id.* ¶ 22.

7 *Id.*, Warehouse Endorsement.

8 *Id.*, Ex. 10, "Whereas" clause.

9 *Id.* ¶ 1(a)(ii). *See also* Rule 56.1 St. ¶¶ 42-47; Nicoletti Aff., Nov. 18, 2004, Ex. 20 (Loevinger Dep., May 12, 2004) at 97-100. Title to the inventory was passed effective September 4, 2001, but the rest of the assets were transferred on March 19, 2002. Rule 56.1 St. ¶¶ 53-54. Though the Agreement provides that a list of insurance policies be attached to the agreement (see ¶ 4(j)(v)), the list apparently never was attached. Nicoletti Aff., Nov. 18, 2004, Ex. 26 (Rudoff Dep.), 46-49.

10 Rule 56.1 St. ¶ 59. For its part, OWC NY changed its name to A&L Asset Management, Ltd. after the proposed name was rejected. *Id*, ¶¶ 57-58.

11 Nicoletti Aff., Nov. 18, 2004, Ex. 16. *See also* Rule 56.1 St. ¶¶ 61-67.

necessary to adjust premiums. In a letter dated March 28, 2002, Palmieri enlisted Bromberg's help to "review with the assured their coverage to determine if any changes are required for th[e] policy's renewal" in anticipation of the anniversary date, April 29, 2002.[12] Bromberg assisted One Beacon, but he never advised Palmieri that any changes were necessary[13] even though he ordinarily tells the insurer of changes in management or ownership as soon as such information is received.[14]

The extent of Bromberg's knowledge during this period concerning the sale of the candle business is uncertain. Loevinger says that he told Bromberg prior to the Policy's renewal that he was selling the business via a sale of assets and "that a new group of corporate officers were taking over the management and ownership of Old Williamsburg Candle Corp."[15] Bromberg equivocated substantially in his deposition.[16] He admitted, however, that he met OWC DE's comptroller, Yaniv Mazor, before the renewal date.[17] Mazor was introduced to him "[a]s a controller

---

12 Nicoletti Aff., Nov. 18, 2004, Ex. 8(J).

13 Rule 56.1 St. ¶ 69.

14 Nicoletti Aff., Nov. 18, 2004, Ex. 22 (Bromberg Dep.), 79-80.

15 Zola Aff., Dec. 17, 2004, Ex. A (Loevinger Aff.) ¶ 10. Loevinger says also that he told Bromberg that only the business was sold, and that he was retaining ownership of the buildings. *Id.*, Ex. F (Loevinger Dep., Nov. 19, 2004) at 133.

16 At times, Bromberg seemed to say he had been told the business had been sold. *See, e.g.*, Nicoletti Aff., Nov. 18, 2004, Ex. 22 (Bromberg Dep.) at 34-35, 128-29. At other times, he implied that he had not known. *Id.* at 81, 126-27. As of December 2002, he "probably" knew Loevinger was not involved in the company at all, but he "can't state for sure." *Id.* at 92, 101. He claimed also not to have known for certain what the ownership or management structure was. Furthermore, he claimed not to have known that the deal was structured as a sale of assets rather than a stock purchase. *Id.* at 47.

17 *Id.* at 44.

[*sic*] for the Israeli operations [*sic*] that was buying the business or merging with [Loevinger] for the business."[18] Prior to the closing of the APA on March 19, 2002, Mazor and Bromberg apparently discussed OWC DE's insurance needs over the telephone.[19] Furthermore, Bromberg apparently "brief[ed] [Mazor] onto what the renewal premiums and coverages [would be]" and Mazor signed "a finance contract" for Bromberg even though Bromberg previously had dealt exclusively with Loevinger.[20] Saliently, Bromberg acknowledged that he specifically asked Loevinger, presumably around this time, whether the name of the company was staying the same; Loevinger answered that it was.[21]

One Beacon issued a new endorsement effective April 29, 2002.[22] One Beacon subsequently continued to accept premium payments, albeit from OWC DE rather than OWC NY. On December 22 or 23, 2002, Mazor and Bromberg discussed "[m]oving one million dollars of inventory [coverage from one warehouse] to a different [and new] location"[23] because OWC DE

---

18 *Id.* at 127. Bromberg acknowledged also that he knew during a meeting with Mazor on December 22 or December 23, 2002 that Mazor had authority to discuss changes in insurance for the company based on the initial meeting in "April or May [2002], whatever [sic] it was I met him." *Id.* at 154-55.

19 *Id.*, Ex. 17 (Mazor Dep., Sept. 23, 2004) at 73-75.

20 *Id.*, Ex. 22 (Bromberg Dep.) at 46.

21 *Id.* at 131. This testimony is corroborated by the depositions of Loevinger and Mazor.

22 *Id.*, Ex. 1(1), Endorsement effective Apr. 29, 2002.

23 *Id.*, Ex. 22 (Bromberg Dep.) at 152-53.

"needed more space" for storage.[24] In an endorsement effective December 23, 2002 and executed by Palmieri, the Policy was amended to move one million dollars of liability coverage from the warehouse at 300 Liberty Avenue to that at 315 Liberty Avenue, across the street.[25] Three days later, on December 26, 2002, OWC DE suffered serious loss to the inventory located in two adjacent warehouses due to "[e]xtensive fire."[26] The next day, OWC DE submitted a claim under the Policy to One Beacon through Elite.[27]

One Beacon subsequently brought this action against OWC NY and OWC DE, seeking a declaration that it has no obligation to indemnify under the Policy.[28] One Beacon now moves for summary judgment against OWC DE.

*Discussion*

A. ____*Summary Judgment Standard*

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

24 *Id.*, Ex. 18 (Mazor Dep., July 9, 2003) at 116.

25 *Id.*, Ex. 1(1), Warehouse Endorsement effective Dec. 23, 2002.

26 *Id.*, Ex. 8(K). Inventory losses allegedly occurred in the warehouses located at 300 Liberty Avenue and 143 Alabama Avenue in Brooklyn. *Id.*

27 *Id.*, Ex. 8 (Palmieri Aff.) ¶ 25.

28 Default judgment was entered against OWC NY.

bear the burden of proof at trial."[29] In deciding such a motion, a district court must resolve all ambiguities and make all reasonable inferences in favor of the nonmoving party.[30] At the same time, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."[31]

B. *The Merits*[32]

The Policy provides that "[t]his policy shall be void if assigned or transferred without the written consent of the Company."[33] One Beacon argues that the Policy was voided by its assignment to OWC DE and moves for summary judgment on that basis.

---

29 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

30 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

31 *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

32 Plaintiff contends that the Policy is governed by the law of admiralty because it is a marine insurance contract. This implies that federal law controls where it exists and that New York law fills any gaps. *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310 (1955). This would be the case regardless of the source of subject matter jurisdiction. *Norfolk Southern Ry. v. James N. Kirby, Pty Ltd.*, ___ U.S. ___, 125 S. Ct. 385, 392 (2004) ("[S]ubstantial rights . . . are not to be determined differently whether [a] case is labelled 'law side' or 'admiralty side' on a district court's docket."), *quoting Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 411 (1953). Because this case is "local," plaintiff's position is perhaps not tenable after *Norfolk Southern*. Arguably, only New York law would govern in the case of a local dispute relating to an insurance contract. It is unnecessary to resolve these issues. Neither party has pointed to an issue controlled by federal law, and both rely on New York law in their briefs. *See Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128 (S.D.N.Y. 2000), *aff'd,* 242 F.3d 367 (2001). The Court therefore applies New York law.

33 Nicoletti Aff., Nov. 18, 2004, Ex. 1(1) ¶ 22.

Plaintiff urges that OWC DE is not covered because (1) the assignment clause unambiguously required written consent to the Policy's assignment and is enforceable, (2) OWC NY and OWC DE are distinct legal entities,[34] (3) OWC NY assigned the Policy to OWC DE,[35] and (4) One Beacon never gave written consent. Though the argument initially is compelling,[36] that is not the end of the tale.

The evidence would permit a trier of fact to conclude that Bromberg was told prior to the closing and, in any case, prior to the "renewal" of the Policy that the business was being sold. While defendant's evidence that Bromberg was told that the transaction would be structured as a sale of assets and thus would involve an assignment of the Policy is equivocal, the Court is obliged for purposes of this motion to infer that Bromberg was told the structure of the deal. In any case, "whatever is notice enough to excite attention, and put a party upon his guard and call for inquiry, is notice of everything to which such inquiry might have led."[37] The trier here would be entitled to

---

34 Rule 56.1 St. ¶ 41.

35 *See* Nicoletti Aff., Nov. 18, 2004, Ex. 10, ¶ 1(a)(ii).

36 *See, e.g., Cremo Light Co. v. Parker*, 118 App.Div. 845, 847, 103 N.Y.S. 710 (1st Dept. 1907) ("That a policy of insurance is a personal contract running to the assured and that it may not be assigned to another without the consent of the insurer is familiar law. It is equally clear that a new corporation, organized under a separate charter, is quite a different entity from a former corporation organized under a different charter, and the two corporations are still to be considered different entities, notwithstanding one may have been formed for the express purpose of taking over and may have taken over all the assets and business of the former."), *cited in Travelers Indem. Co. v. Israel*, 354 F.2d 488, 490 n.2 (2d Cir. 1965).

37 *Skinner v. Norman*, 165 N.Y. 565, 570, 59 N.E. 309, 310 (1901). *See also L. Smirlock Realty Corp. v. Title Guarantee Co.*, 70 A.D.2d 455, 463, 421 N.Y.S.2d 232, 237 (2d Dept. 1979) ("[T]he question of materiality is not limited to the knowledge that would have been gained by the insurer from disclosure of the particular suppressed fact alone; it extends to

find either that Bromberg was told or that he was on sufficient notice to make him chargeable with knowledge that the Policy would be assigned. In consequence, the motion boils down to whether One Beacon is chargeable with Bromberg's knowledge, actual and constructive, and, if so, the consequences of such knowledge.

### *1. One Beacon Is Chargeable With the Knowledge of its Agent*

An agent's knowledge is imputed to the principal so long as the agent acts within the scope of his agency.[38]

"[A]n agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other

---

any information that might have been revealed had further inquiry followed the initial disclosure of the suppressed facts."); RESTATEMENT (SECOND) OF AGENCY § 277 ("The principal is not affected by the knowledge which an agent should have acquired in the performance of the agent's duties to the principal or to others, *except where the principal or master has a duty to others that care shall be exercised in obtaining information*.") (emphasis added). As One Beacon had a duty to its stockholders to inform itself with respect to underwriting risks, it is chargeable with knowledge that its agent Bromberg should have acquired.

In this connection, it is significant that Loevinger testified that he told Bromberg that he wanted to be sure that his company could not be liable after the sale. Zola Aff., Dec. 17, 2005, Ex. F (Loevinger Dep., Nov. 19, 2004), at 69-70. This testimony surely is susceptible of the inference that the buyer of the business was a separate corporation. Given also the evidence that Bromberg discussed with Mazor the post-sale insurance requirements of the business, a trier would be entitled to find that Bromberg understood perfectly well that a new company was buying the business and that the Policy was being assigned to that buyer.

[38] *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001), *citing Christopher S. v. Douglaston Club*, 275 A.D.2d 768, 769, 713 N.Y.S.2d 542, 543 (2d Dept. 2000); *see also Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 488 N.E.2d 828, 829 (1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.").

to act.'"[39] The agency agreements between One Beacon and Elite characterized Elite as its agent.[40] They authorized Elite to accept, bind, issue or endorse policies to the extent authorized in attached statements of binding authority; to collect premiums; and, subject to certain limits, to effect any necessary changes on policies in force even once the agreements were terminated.[41] Moreover, at

---

39 *N.Y. Marine & Gen. Ins. Co.*, 266 F.3d at 122, *quoting Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496, 499 (4th Dept. 1981); *see also* RESTATEMENT (SECOND) OF AGENCY § 15 ("An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act.").

40 Plaintiff argues that the agency agreements are irrelevant because IMU issued the Policy, while the agency agreements were "issued by One Beacon's commercial insurance office in Melville, New York which, itself, did not and does not bind, issue or endorse policies in the ocean marine insurance line of business." Nicoletti Aff., Dec. 30, 2004, Ex. 2 (Gallagher Aff.) ¶ 14. That argument may be refuted with two independent observations. First, the Policy says on its face that "[c]overage [is] provided by Commercial Union Insurance Company, herein called the Company or Assurers." Nicoletti Aff., Nov. 18, 2004, Ex. 1(1). Commercial Union Insurance Company is a party to both agency agreements. Nicoletti Aff., Dec. 30, 2004, Exs. 1(A), 1(B). Second, the agency agreements provide that Elite may bind "Inland Marine" policies up to a limit of $25,000 without prior approval. Nicoletti Aff., Nov. 18, 2004, Ex. 1(1), Statement of Binding Authority. The Policy at issue here was an ocean marine policy. However, if IMU issues inland marine insurance policies, then the argument that the agency agreement does not affect IMU falls apart. It would be reasonable to infer that IMU does issue inland marine insurance based on the fact that IMU is "the marine department of One Beacon Insurance Company." Nicoletti Aff., Dec. 30, 2004, Ex. 2 (Gallagher Aff.) ¶ 1.

41 *See generally id.*, Exs. 1(A), 1(B). It reasonably may be inferred that Elite has broad agency powers even when, as here, it has no independent authority to bind insurance. The agency agreements can be terminated by either party upon written notice, in which case Elite would have no "authority to issue claim drafts and solicit, bind, execute, or issue contracts of insurance for new business, certificates or renewals, or to increase or extend liability on any existing policy." *Id.*, Exs. 1(A) § XI(a)(4)(i), 1(B) § XI(a)(4)(i). However, in the event of termination, Elite would retain the power "subject to underwriting rules and practices of Company, to effect any necessary changes on inforce policies of insurance, provided that the changes do not increase or extend Company's liability under, or alter the terms of, any such policy." *Id.*, Exs. 1(A) § XI(a)(4)(iv), 1(B) § XI(a)(4)(iv). Similarly, though the agency agreements expressly require "[p]rior approval" "[t]o solicit, receive, accept, bind, issue or endorse [marine] insurance contracts," Elite may be inferred to possess broad agency powers. *Id.*, Exs. 1(A) § I(b), 1(B) § I(b).

the time of the Policy's renewal, Palmieri of One Beacon instructed Bromberg to "review with the assured their coverage to determine if any changes are required for th[e] policy renewal."[42] Hence, even bearing in bind that the "characteriz[ation] as [an] 'insurance agent[]' or 'broker[]' is not dispositive of the agency issue,"[43] the evidence is quite sufficient to justify conclusions that Elite was One Beacon's agent and that Bromberg's knowledge concerning the sale of OWC NY's business was acquired within the scope of his agency.

---

42

Nicoletti Aff., Nov. 18, 2004, Ex. 8(J).

43

*OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, ___ F. Supp.2d ___, No. 04-2271, 2005 WL 100849 at *4 (S.D.N.Y. 2005), *citing Price v. Lawrence-Van Voast, Inc.*, 58 A.D.2d 727, 727, 396 N.Y.S.2d 296, 297 (3d Dept. 1977); *see also Matco Products, Inc. v. Boston Old Colony Ins. Co.*, 104 A.D.2d 793, 796, 480 N.Y.S.2d 134, 137 (2d Dept. 1984) ("There must be evidence of some action on the insurer's part, or facts from which a general authority to represent the insurer may be inferred, in order to convert an insurance broker into an agent of the insurer.").

Under the Policy's brokers clause, "the Assured's brokers . . . shall be deemed to be exclusively the agents of the Assured and not of this Company in any and all matters relating to, connected with or affecting this insurance." Nicoletti Aff., Nov. 18, 2004, Ex. 1(1) ¶ 62 (emphasis added). However, this clause is inapposite because it does not apply to Elite. The Policy specifies that "notice of the occurrence of any and all losses which are apt to be a claim under this Policy shall be given *to the Assurer or its agent or to the nearest of its representatives*." *Id.* ¶ 43 (emphasis added). In a subsequent clause, the insured is instructed to "declare . . . for transmission to this Company all shipments and/or risks coming within the terms hereof" to Elite Insurance Agency, giving Elite's address. *Id.* ¶ 58. These clauses, together, imply that Elite was an agent or representative of One Beacon, at least for the purpose of giving notice. Because the brokers clause specifies that brokers are "*exclusively* the agents of the Assured and not of this Company *in any and all matters*," that clause does not apply to Elite.

*2. One Beacon May Not Avoid the Policy*

Were a trier of fact to conclude that Bromberg knew of the assignment and that this knowledge was chargeable to One Beacon, One Beacon could not avoid the Policy. This conclusion may be reached by different paths.

First, "where the insurer has the absolute right to terminate a policy on its anniversary date, each renewal of the policy is deemed the issuance of a new policy."[44] Here, One Beacon had that right. It nevertheless "renewed" the Policy, and it arguably did so while chargeable with knowledge that the Policy had been assigned to OWC DE. In that event, the renewal would have constituted the issuance of a new policy, thus making the March 19, 2002 assignment immaterial.

The same conclusion would result as a matter of equitable estoppel. Where an insurance carrier knowingly conceals or misstates facts with the intention or the expectation that such conduct will be relied upon, and the insured substantially changes its position to its detriment in reasonable reliance upon the false impression thus created, the carrier is estopped from taking a position inconsistent with that which was misstated or concealed.[45] A trier would be entitled to find

---

44

*Moore v. Met. Life Ins. Co.*, 75 Misc. 2d 168, 346 N.Y.S.2d 298 (Sup. Ct. N.Y. Co. 1972), *aff'd*, 41 A.D.2d 601, 340 N.Y.S.2d 586 (1st Dept. 1973), *aff'd*, 33 N.Y.2d 304, 307 N.E.2d 554 (1973), *cited in In re New England Marine Servs.*, 174 B.R. 391, 397 (Bankr. E.D.N.Y. 1994)); *see also Gladstone v. Metropolitan Life Ins. Co.*, 66 Misc. 2d 656, 657, 322 N.Y.S.2d 528 (N.Y. Civ. Ct. 1971). The insurance policy in *Moore* had a 90 day cancellation clause.

45

*General Electric Capital Corp. v. Armadora*, 37 F.3d 41, 45 (2d Cir. 1994); *see also Triple Cities Constr. Co. v. Maryland Casualty Co.*, 4 N.Y.2d 443, 448, 151 N.E.2d 856, 858 (1958), *cited in E.F.S. Ventures Corp. v. Foster*, 71 N.Y.2d 359, 369, 520 N.E.2d 1345, 1350 (1988); *Mattimore v. Patroon Fuels, Inc.*, 103 A.D.2d 981, 982, 479 N.Y.S.2d 839, 841 (3d Dept. 1984) ("[E]quitable estoppel can . . . prevent an insurer from asserting . . . exclusions to coverage."); *Lampke v. Metropolitan Life Ins. Co.*, 279 N.Y. 157, 165, 18 N.E.2d 14, 17 (1938) ("[W]here an insurance company has by its conduct induced a person to enter into a contract of insurance, thereby giving it an advantage it would be against

that that is exactly what occurred here. One Beacon renewed the Policy while it was chargeable with knowledge that the Policy had been assigned notwithstanding the anti-assignment clause. It thus created the impression that the Policy was in force, an impression that it intended the insured to rely upon when making premium payments. The insured, ignorant of the alleged voidability of the Policy, paid the premiums and abstained from procuring other coverage.

One Beacon seeks to avoid the consequences of these facts by contending that it did not deliberately mislead OWC DE. That is immaterial. "An innocent misleading of another party may estop one from claiming the benefits of his or her deception."[46]

---

equity and good conscience to permit it to assert, the company cannot, in a court of law, assert such advantage. To permit an insurance company to accept the payment of premiums on a policy which it knew when issued was void from its inception would constitute a fraud on the policyholder."), *citing Sternaman v. Metropolitan Life Ins. Co.*, 170 N. Y. 13, 23, 62 N.E. 763, 766 (1902); *Bible v. John Hancock Mut. Life Ins. Co.*, 256 N. Y. 458, 462, 176 N.E. 838, 840 (1931)).

46

*State Farm Ins. Co. v. Lofstad,* 278 A.D.2d 224, 225, 717 N.Y.S.2d 287, 288 (2d Dept. 2000). *Accord, e.g., Sterling v. Interlake Indus., Inc.,* 154 F.R.D. 579, 585 (E.D.N.Y. 1994) ("There does not have to be an actual attempt to mislead. It is sufficient that the party being estopped knew or had reason to believe that their acts or inaction might prejudice the party asserting the estoppel."). *See also General Electric Capital Corp. v. Armadora*, 37 F.3d 41, 45 (2d Cir. 1994) ("Under New York law, equitable estoppel requires a showing of . . . [a]ctual *or constructive* knowledge of the true facts by the wrongdoers.") (emphasis added).

*Conclusion*

The record betrays genuine issues of fact relating to Elite's agency status and the extent of Bromberg's knowledge. These issues are material to the outcome of the suit and, accordingly, plaintiff's motion for summary judgment is denied.

SO ORDERED.

Dated: June 30, 2005

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)